UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| GREGORY KONRATH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 1:16-cv-02784-LJM-DKL |
| | ) |
| ALLISON VANCE, | ) |
| INDIANAPOLIS MONTHLY, and | ) |
| EMMIS PUBLISHING CORPORATION, | ) |
| | ) |
| Defendants. | ) |

## **ORDER ON ANTI-SLAPP MOTION TO DISMISS**

This matter comes before the Court on Defendants', Allison Vance ("Vance"), Indianapolis Monthly ("IM"), and Emmis Publishing Corporation ("Emmis," and collectively with Vance and IM, the "Defendants"), Anti-SLAPP Motion to Dismiss (the "Motion to Dismiss"). Dkt. No. 61. In the Motion to Dismiss, the Defendants assert that Plaintiff Gregory Konrath's ("Konrath's") defamation claims against them should be dismissed under Indiana's Anti-SLAPP statute, Ind. Code §§ 34-7-7-1, *et seq.*, because the allegedly defamatory statements (1) were made in good faith pursuant to their rights to free speech on matters of public interest and (2) do not meet the requirements for defamation. *See generally*, Dkt. No. 62. Konrath, however, contends that the Defendants' statements were defamatory and have been harmful to his reputation in the community. See generally, Dkt. No. 65.

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss.

1

## I. BACKGROUND

This action arises out of an article written by Vance and published in the July 2015, edition of IM, entitled "The Proposal" (the "Article"). Dkt. No. 59 at 2. IM is a magazine operated by Emmis, an Indiana corporation with its principal place of business in Indianapolis, Indiana. *Id.* at 1-2. In the Article, Vance addressed allegedly criminal activities conducted by Konrath between 2014 and 2015. *Id.* at 2. Specifically, the Article explains how Konrath, an orthopedic surgeon from Peru, Indiana, plotted to kill his ex-wife and was later convicted of stalking his ex-wife and ex-girlfriend. *See generally*, Dkt. No. 62, Ex. A. The Article also described Konrath's past legal issues and episodes of aggressive behavior. *Id.* at 5. Konrath alleges that the Article contained numerous "misrepresentations and outright lies" that irreversibly damaged his reputation as a respected orthopedic surgeon, author, and internationally-renowned mountain climber. Dkt. No. 59 at 3.

### A. KONRATH'S CRIMINAL HISTORY

In June 2014, Konrath and his then-cohabitating girlfriend, Joannah Bierzychudek ("Bierzychudek"), decided to go on vacation together to San Juan, Puerto Rico. Dkt. No. 62, Ex. C-7 ("Press Release") at 1. On June 29, 2014, while in San Juan, Puerto Rico, Konrath began discussing with Bierzychudek specific details of a plan he had formulated to kill his ex-wife, Ana Konrath ("Ana"), including steps he had already undertaken to further the plan. Dkt. No. 62, Ex. C-1 ("Attempted Murder P.C. Aff.") at 1; Press Release at 1. As Konrath described his murder plan, Bierzychudek began secretly recording their conversation on her phone (the "Recording"). Attempted Murder P.C. Aff. at 1; Dkt. No.

62, Ex. C-8 ("Recording"). Konrath told Bierzychudek that he planned to make Ana's death look like a suicide by shooting her in the head and then placing the gun in her hand. Attempted Murder P.C. Aff. at 1; Recording, 2:15-17. Konrath also stated that he had already placed hollow point bullets in Ana's home and had purchased an untraceable gun that he always handled with gloves. Attempted Murder P.C. Aff. at 1-2; Recording, 3:5-22, 6:18-7:11. Konrath further indicated that he planned to wear an extra layer of clothing that he could dispose of after the murder before going home. Attempted Murder P.C. Aff. at 1; Recording, 12:14-17. Moreover, Konrath stated that he researched how best to position Ana's body to make her death look like a suicide and drafted text messages to send to Ana's family members from her phone after the murder that demonstrated suicidal intent. Recording, 7:12-20, 11:22-12:7. Konrath specified that he would carry out his plan on a night on which he was not on call so that he could leave his cell phone at home to prevent being tracked to Ana's home. Recording, 4:18-5:15. Konrath also stated that he planned kill Ana while their three children were sleeping in Ana's home. *Id.* at 3:23-4:15.

Shortly after recording Konrath's detailed plan to kill Ana, Bierzychudek left San Juan, Puerto Rico, without Konrath to return to Peru, Indiana. Dkt. No. 62, Ex. B-2 at 3. On July 4, 2014, Konrath called the Miami County Sheriff's Office, asking for an officer to check on Bierzychudek at the home the couple shared, claiming that Bierzychudek had made suicidal statements. Attempted Murder P.C. Aff. at 1. When the police arrived at the home, Bierzychudek informed the officers that she was not suicidal and shared the Recording with them. *Id.* Upon receiving Bierzychudek's consent, the officers searched

the shared home and discovered in the garage a .38 caliber revolver inside a plastic bag that was loaded with hollow point ammunition and covered with latex gloves. *Id.* at 2. The officers also discovered a set of surgical scrubs, black sweatpants, cloth gloves, and sandals in another bag next to the plastic bag containing the revolver. *Id.* In light of the officers' discoveries, Konrath was arrested and charged with attempted murder on July 8, 2014. Dkt. No. 62, Ex. C-2.

Konrath was released from jail on bond on August 4, 2014. Dkt. No. 62, Ex. C-3 ("Stalking P.C. Aff.") at 1. Upon his release, Konrath was served with a No Contact Order, which required him to have no contact with either Ana or Bierzychudek. *Id.*; Dkt. No. 62, Ex. C-4 ("Stalking Warrant Hearing"), 4:7-5:15. However, Konrath violated the No Contact Order by attempting to contact both Bierzychudek and Ana shortly after his release. Dkt. No. 62, Ex. C-5 ("Change of Plea Hearing"), 8:6-9:22. Specifically, Konrath attempted to contact Bierzychudek through e-mail and physical mail to Bierzychudek's post office box in order to obtain her updated address. Stalking P.C. Aff. at 1. Konrath also hired a private investigator and asked an acquaintance to pose as a financial loan officer in order to obtain Bierzychudek's address. *Id.* Konrath further used his position as a medical doctor to order a fraudulent prescription for Bierzychudek and to inquire as to Bierzychudek's current physician. *Id.* at 1-2. Moreoever, Konrath's daughter sent a text message to Bierzychudek, asking Bierzychudek to meet Konrath for dinner. *Id.* at 2. In addition to his attempts to contact Bierzychudek, Konrath also attempted to contact Ana by having his children speak to Ana on his behalf. Dkt. No. 62, Ex. C-6 ("Stalking Sentencing Hearing"), 15:15-16.

Based on his attempted contacts with Bierzychudek and Ana, Konrath was charged with two counts of stalking and one count of ordering a fraudulent prescription on September 9, 2014. Stalking P.C. Aff. at 1. On December 16, 2014, Konrath plead guilty to the two counts of stalking. Change of Plea Hearing, 6:19-20. In light of his guilty plea for the stalking counts, Konrath received a ten-year sentence on January 20, 2015, in which he was to spend one year in prison, one year in community corrections, and eight years on probation. Dkt. No. 62, Ex. C-10 ("Stalking Sentencing Order") at 1.

After reviewing the Indiana Court of Appeals decision in *Collier v. State*, 846 N.E.2d 340 (Ind. Ct. App. 2006), and after comparing the facts of that case to Konrath's case, Miami County Prosecutor Bruce Embrey ("Embrey") decided to drop the attempted murder charge against Konrath. Dkt. No. 62, Ex. C ("Embrey Declaration"), ¶ 7. Embrey issued a press release on January 20, 2015, in which he addressed his decision to drop Konrath's attempted murder charge, Bierzychudek's recording of Konrath's murder plan, and Konrath's guilty plea for stalking Bierzychudek and Ana. Press Release at 1-2.

On April 14, 2015, Konrath was released from prison and was placed on home detention. Dkt. No. 62, Ex. C-9 ("Escape P.C. Aff."); Dkt. No. 62, Ex. D at 3-4. Upon his release, Konrath was required to wear an ankle monitor that would alert officers when he was within fifty miles of Ana's home or within twenty miles of Bierzychudek's home. Stalking Sentencing Hearing, 19:21-20:25. On April 28, 2015, Konrath removed his ankle monitor and fled to Scottsdale, Arizona, where he was arrested. Escape P.C. Aff. Based on his attempted escape, Konrath was ordered to serve another year in prison, which was to run consecutively with his prior stalking sentence. Dkt. No. 62, Ex. E.

## B. RESEARCH AND DEVELOPMENT OF THE ARTICLE

Vance first learned of Konrath's criminal case after reading an article published in the *Indianapolis Star* newspaper in July 2014. Dkt. No. 62, Ex. B ("Vance Declaration"), ¶ 4. In March 2015, Vance began investigating, researching, and writing the Article. *Id.* at ¶ 5. Over the course of the next three months, Vance spent more than one hundred hours researching and writing the Article, which included conducting several witness interviews and reviewing public records related to Konrath's case. *Id.* When investigating Konrath's case, Vance interviewed Bierzychudek and Embrey on multiple occasions and even conducted an interview with Konrath during his incarceration. *Id.* at ¶¶ 6-8. Vance also spoke with other individuals with information regarding either Konrath's alleged criminal activity or Konrath personally, including Detective Mike Rogers of the Miami County Sheriff's Department; law professor, Matthew Lippman, from the University of Illinois—Chicago; orthopedic product sales representatives, Garret Pino and Logan Sadtler; private investigator, Dale Seward; and Konrath's former climbing guide, Guy Cotter. *Id.* at ¶¶ 9-13. Vance further attempted to contact Ana and Konrath's oldest daughter regarding the Article, but neither agreed to speak with Vance. *Id.* at ¶¶ 14-15.

Vance also obtained and reviewed several court records and other public documents pertaining to Konrath's case. *Id.* at ¶ 16. Among other documents, Vance reviewed probable cause affidavits relating to Konrath's charges for attempted murder, stalking and ordering a fraudulent prescription, and escape; arrest warrants; a transcript of Konrath's search warrant/arrest warrant hearing on August 22, 2014; a transcript of Konrath's change of plea hearing on December 16, 2014; a transcript of Konrath's

6

sentencing hearing on January 20, 2015; and Embrey's January 20, 2015, press release regarding Konrath's sentencings. *Id.* Once she finished drafting the Article, Vance also submitted the Article to her editors at IM for editing and fact-checking before it was to be published. *Id.* at ¶ 17.

### C. KONRATH'S CURRENT ACTION

Konrath alleges that he was defamed by the Article. Dkt. No. 59 at 2. Specifically, Konrath alleges in his Response in Opposition to the Motion to Dismiss that the following nine statements within the Article are defamatory[1]:

(1) Page 78, paragraph 4: Konrath was behind on his child support payments and owed Ana $1.3 million in child support;

(2) Page 78, paragraph 8: Ana had a $1 million life insurance policy for which Konrath was the beneficiary;

(3) Page 79, paragraph 1: Bierzychudek fled the morning after making the Recording, when she actually waited four days after making the Recording before returning to Peru, Indiana;

(4) Page 79, paragraph 4: police obtained a warrant to search his home when the police actually searched his home without a warrant;

(5) Page 79, paragraph 10: Konrath broke the No Contact Order for Ana;

(6) Page 132, paragraph 4: Konrath was arrested for stalking and for writing an invalid prescription eight days after being released on bail, when he was actually arrested for three misdemeanor counts of alleged invasion of privacy;

(7) Page 134, paragraph 3: Konrath had a tantrum of some kind during an avalanche on Mount Tasman that killed six people and that Konrath suffered a high altitude cerebral edema on his 2004 attempt to climb Mount Everest;

---

[1] The Defendants addressed the potentially defamatory nature of twenty-four different statements from the Article within their Brief in Support of the Motion to Dismiss. *See* Dkt. No. 62 at 22-35. However, since Konrath's Response in Opposition only addressed nine allegedly defamatory statements, any claims Konrath may assert in relation to any other statements within the Article are waived. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (finding that undeveloped arguments and arguments unsupported by pertinent authority are waived).

7

(8) Page 134, paragraph 2: Konrath physically hurt Bierzychudek; and

(9) Page 134, paragraph 1: Konrath was convicted of a DUI in 1998 for which he spent two days in jail and served thirty-six months on probation, when Konrath's DUI actually resulted in a misdemeanor that did not require any jail time or probation.

Dkt. No. 65 at 2-6.

## II. GOVERNING LEGAL STANDARDS

### A. INDIANA ANTI-SLAPP ACT

Indiana's Anti-SLAPP Act (the "Act"), Ind. Code §§ 34-7-7-1 *et seq.*, provides a defense to "'meritless suits aimed at silencing a plaintiff's opponents, or at least diverting their resources.'" *Brandom v. Coupled Prod., LLC*, 975 N.E.2d 382, 385 (Ind. Ct. App. 2012) (quoting *Hamilton v. Prewett*, 860 N.E.2d 1234, 1241-42 (Ind. Ct. App. 2007)). The Act "is intended to reduce the number of lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." *Brandom*, 975 N.E.2d at 385. In order to reduce the number of lawsuits designed to chill speech, "a defendant who prevails on a motion to dismiss under the anti-SLAPP statute is entitled to recover reasonable attorney's fees and costs." *Id.* (citing Ind. Code § 34-7-7-7). The Act provides:

> It is a defense in a civil action against a person[2] that the act or omission complained of is: (1) an act or omission of that person in furtherance of the person's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Indiana in connection with a public issue; and (2) an act or omission taken in good faith and with a reasonable basis in law and fact.

---

[2] The Act defines "person" as either an individual or any other legal entity, which means that IM and Emmis, as well as Vance, are "persons" covered under the Act. Ind. Code § 34-7-7-4.

8

Ind. Code § 34-7-7-1.

Although the Defendants filed the Motion to Dismiss under the Act, the statute provides that a motion to dismiss is to be treated like a motion for summary judgment.[3] Ind. Code § 34-7-7-9(a)(1). Further, the Act provides that "the person who files a motion to dismiss must state with specificity the public issue . . . that prompted the act in furtherance of the person's right of . . . free speech under the Constitution of the United States or the Constitution of the State of Indiana." Ind. Code § 34-7-7-9(b). The Act also requires that the Court base its decision on "facts contained in the pleadings and affidavits filed and discovered under the expedited proceeding." Ind. Code § 34-7-7-9(c).

The Court shall grant an anti-SLAPP motion to dismiss if the party filing the motion to dismiss "has proven, by a preponderance of the evidence, that the act upon which the claim is based is a lawful act in furtherance of the person's right of . . . free speech under the Constitution of the United States or the Constitution of the State of Indiana." Ind. Code § 34-7-7-9(d). However, the "preponderance of the evidence" requirement provided in the statute is in conflict with Indiana Trial Rule 56 that states that the movant's burden on a motion for summary judgment is to make a "prima facie" showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Indiana courts have resolved this conflict in favor of Trial Rule 56. *See Shepard v.*

---

[3] Based on this statutory requirement, Konrath was notified that the Motion to Dismiss would be treated as a Motion for Summary Judgment and that he had a right to file his response and to submit any evidence he possessed to refute the claims made by Defendants in the Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1. Dkt. No. 64.

*Schurz Commc'ns, Inc.*, 847 N.E.2d 219, 224 (Ind. Ct. App. 2006). Because there is no conflict between Indiana Trial Rule 56 and Federal Rule of Civil Procedure 56 ("Rule 56"), which provides the procedure for obtaining summary judgment in federal court, Rule 56 is controlling in this case. *See Hanna v. Plummer,* 380 U.S. 460, 465 (1965).

Substantively, the Act does not replace the Indiana common law of defamation but provides simply that the movant must establish that her speech was "lawful." Ind. Code § 34-7-7-9(d). *See also*, *Shepard*, 847 N.E.2d at 224; *Brandom*, 975 N.E.2d at 389.

## B. SUMMARY JUDGMENT

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Rule 56, which provides in relevant part: "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed. Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, (1986). The nonmoving party

bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir. 1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence. *See Bombard v. Ft. Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson,* 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the Court to the lack of evidence as to an element of that claim. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be

granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996).

## C. DEFAMATION

A defamatory statement is a statement that tends to harm a person's reputation by lowering the community's estimation of the person or by deterring third parties from dealing or associating with the person. *See Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007). *See also*, *Lovings v. Thomas*, 805 N.E.2d 442, 447 (Ind. Ct. App. 2004) ("Defamation is that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or excite derogatory feelings or opinions about the plaintiff."). To maintain an action for defamation under Indiana law, a "plaintiff must demonstrate (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages." *Kelley*, 865 N.E.2d at 596-97.

Similar to public figures, a private individual bringing a claim for defamation under Indiana law "'must show 'actual' malice in matters of public or general concern.'" *Nikish Software Corp. v. Manatron, Inc.*, 801 F. Supp. 2d 791, 798 (S.D. Ind. 2011) (quoting *Poyser v. Peerless*, 775 N.E.2d 1101, 1107 (Ind. Ct. App. 2002)). *See also*, *Brewington v. State*, 7 N.E.3d 946, 962 (Ind. 2014) ("We have extended the stringent [actual malice] standard to 'defamation cases involving matters of public or general concern,' even if the victim is a private figure."). Whether a controversy constitutes a matter of public or general concern requiring an actual malice analysis is a question of law for the Court to determine. *See Brewington*, 7 N.E.3d at 962. "Actual malice exists when the defendant publishes a defamatory statement with knowledge that it was false or with reckless

12

disregard of whether it was false or not." *Nikish*, 801 F. Supp. 2d at 799 (internal quotations omitted). *See also*, *Shepard*, 847 N.E.2d at 225. While reckless disregard "is not 'measured by whether a reasonably prudent man would have published, or would have investigated before publishing,'" it does require the defendant to seriously question the truth of his or her publication or to be highly aware of its probable falsity. *Brewington*, 7 N.E.3d at 959 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). A defendant's subjective state of mind is a critical factor in determining whether he or she acted with actual malice, "and the question of whether there is sufficient evidence to support finding actual malice is a question of law for the court." *Nikish*, 801 F. Supp. 2d at 799 (internal quotations omitted). *See also*, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989).

The determination of whether a communication is defamatory is a question of law for the Court to decide, unless the communication could be interpreted to be either defamatory or non-defamatory. *See Nikish*, 801 F. Supp. 2d at 798 (citing *Kelley*, 865 N.E.2d at 596-97). To be held liable for defamation, a defendant must make a false statement of fact. *See Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 457 (Ind. 1999) (citing *Heeb v. Smith*, 613 N.E.2d 416, 420 (Ind. Ct. App. 1993)). However, while truth is a defense to defamation, the literal truth is not required. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991); *Heeb*, 613 N.E.2d at 420. A statement is sufficiently true if it has a "substantial basis in the truth" and if the "gist" or "sting" of the statement is true. *Brandom*, 97 N.E.2d at 390-91; *Heeb*, 613 N.E.2d at 421. "The test for determining whether a statement is substantially true is whether any inaccuracies

13

caused the statement to produce a different effect on the audience than would have been produced had the literal truth been spoken." *Heeb*, 613 N.E.2d at 421. *See also*, *Bandido's*, 712 N.E.2d at 457.

## III. ANALYSIS

### A. INDIANA ANTI-SLAPP DEFENSE

For a statement to be covered under the Act, the statement must have been made by a person in furtherance of his or her right of free speech in connection with a public issue or an issue of public interest. Ind. Code §§ 34-7-7-1(a), 34-7-7-5(1). "In Indiana, the public interest is necessarily broad and cases dealing with the law of [Indiana] reveal a panoply of topics within the scope of public interest." *Filippo v. Lee Publ'ns, Inc.*, 485 F. Supp. 2d 969, 974 (N.D. Ind. 2007). An issue is considered to be a matter of general or public interest when "'(t)he public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct.'" *Id.* (quoting *Fazekas v. Crain Consumer Grp. Div. of Crain Comms., Inc.*, 583 F. Supp. 110, 114 (S.D. Ind. 1984)).

In this instance, the Article certainly concerns a matter of public interest. Konrath's criminal allegations received extensive media coverage, including news stories from several local newspapers and television stations, and was featured in a September 2015, episode of ABC's *20/20*. Dkt. No. 62 at 9-10. Konrath also participated in several interviews with journalists for various news reports focusing on his story. *Id.* Furthermore, Konrath has not refuted that his story constitutes a matter of public interest. Therefore,

the Court finds that the Article was written in furtherance of the Defendants' rights to free speech in connection with a matter of public interest.

The Act also requires that the statements forming the basis of the claims be made "in good faith and with a reasonable basis in law and fact." Ind. Code § 34-7-75(2). In the defamation law context in Indiana, "good faith" means "'a state of mind indicating honesty and lawfulness of purpose; belief in one's legal right; and belief that one's conduct is not unconscionable.'" *Brandom*, 975 N.E.2d at 388-89 (quoting *Nexus Grp., Inc. v. Heritage Appraisal Serv.*, 942 N.E.2d 119, 122 (Ind. Ct. App. 2001)). Based on the only evidence available on the subject, Vance has never entertained any serious doubts as to whether the information within the Article was true. Vance Declaration, ¶¶ 20. Vance also believed that the statements and opinions within the Article were fair and reasonable in light of her research into Konrath's story. *Id.* at ¶ 21. Moreover, the information that Vance obtained when conducting her research originated from police and court records, as well as other reliable sources. *Id.* at ¶¶ 5-16. Vance further submitted the Article for fact-checking before it was published. *Id.* at ¶ 17. Thus, the Defendants made the statements within the Article in good faith, with the belief that they were acting honestly and within their legal rights.

Because the Article was an exercise of the Defendants' rights to free speech in connection with a matter of public interest, and because it was written in good faith, dismissal of Konrath's claims is appropriate, pursuant to the Act.

15

## B. DEFAMATION CLAIMS

Even if the Act did not provide a defense to Konrath's defamation claims, the statements made within the Article fail to satisfy all of the elements for defamation. As stated above, in order to maintain a defamation action under Indiana law, a plaintiff must demonstrate that an allegedly defamatory statement (1) has a defamatory imputation; (2) was made with actual malice; (3) was published; and (4) resulted in damages. *See Kelley*, 865 N.E.2d at 596-97.

Konrath has not demonstrated that any of the allegedly defamatory statements were made with actual malice. Although Konrath contends that the above statements are all false, Vance obtained information supporting each of these statements from reliable sources, including public documents and witness interviews. Vance Declaration, ¶¶ 5-16. The Article was also fact-checked prior to publication in an attempt to prevent inaccuracies. *Id.* at ¶ 17. Vance's failure to further investigate these statements to guarantee their accuracy does not constitute bad faith or rise to the level of reckless disregard, as required for actual malice. *See Kitco, Inc. v. Corp. for General Trade*, 706 N.E2d 581, 589-90 (Ind. Ct. App. 1999); *see also*, *Fazekas*, 583 F. Supp. at 114-15 (finding that a journalist's failure "to inquire about the accuracy of the statements" within an article may have amounted to negligence but did not support a finding of actual malice); *Bandido's*, 712 N.E.2d at 465 & n. 32 (contrasting the publication of inaccurate information in an article with cases where actual malice was found). Furthermore, Konrath has provided no evidence that Vance seriously questioned the truth of the Article or became highly aware that it was likely false. *See Brewington*, 7 N.E.3d at 959.

Therefore, these statements fail to satisfy the actual malice element for defamation claims.

Moreover, some of Konrath's allegedly defamatory statements also fail to satisfy the defamatory imputation requirement for defamation claims. While Konrath claims that the Article was defamatory because it stated that Ana has a $1 million life insurance policy for which he is the beneficiary, this statement in no way harms Konrath's reputation. *See Kelley*, 865 N.E.2d at 596. Additionally, despite Konrath's assertion that the Article states Bierzychudek fled San Juan, Puerto Rico, the morning after making the Recording, the Article does not actually indicate when Bierzychudek left San Juan the next morning, Article at 3, and Konrath does not deny that Bierzychudek returned to Indiana without him. Dkt. No. 65 at 3.

Furthermore, several of the allegedly defamatory statements within the Article are substantially true. First, while Konrath alleges that the Article inaccurately stated that the police obtained a warrant to search the home he shared with Bierzychudek, he does not deny that the police received Bierzychudek's consent to legally search the home. Dkt. No. 65 at 3-4. Additionally, although Konrath contends that the Article falsely stated that he violated the No Contact Order in relation to Ana, he does not dispute that he plead guilty to breaking the No Contact Order as to Ana and merely claims that he was coerced to falsely admit to attempting to contact her. *Id*. at 4. Konrath also asserts that the Article falsely states that he was arrested for stalking eight days after being released from prison on bail because he was actually arrested on three counts of misdemeanor invasion of privacy; however, Konrath does not deny that he was arrested eight days after being

17

released on bail in light of his attempts to contact Bierzychudek and Ana. *Id.* Finally, while Konrath argues that the Article defamed him by indicating that he previously served jail time and probation for a DUI he received in 1998, Konrath does not dispute that he was actually convicted of a DUI in 1998 and only refutes the jail time and probation claimed in the Article. *Id*. at 6. Even assuming *arguendo* that these statements do not reflect the literal truth, none of these alleged inaccuracies would "produce a different effect on the audience than would have been produced had the literal truth been spoken." *Heeb*, 613 N.E.2d at 421. Therefore, these statements are substantially true and are not defamatory.

Because Konrath has failed to demonstrate that the Article's allegedly defamatory statements were false, made with actual malice, and had a defamatory imputation, the Court finds that the statements at issue in this action are not defamatory, pursuant to Indiana law.

## IV. **CONCLUSION**

For the reasons stated herein, Defendants' Motion to Dismiss is **GRANTED**. Defendants shall file proof of their reasonable attorney's fees within fourteen days of the date of this Order, and Konrath shall have ten days thereafter to file his objections to Defendants' claimed fees. Once the Court has determined the reasonable attorney's fees and costs to assess, judgment will be entered accordingly.

IT IS SO ORDERED this 18th day of April, 2017.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Robert B. Thornburg
FROST BROWN TODD LLC
rthornburg@fbtlaw.com

GREGORY KONRATH
254068
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362